# In the United States Court of Federal Claims

No. 00-115L

NOT FOR PUBLICATION

(Filed September 5, 2006)

```
* * * * * * * * * * * * * * * * * * *
DAUPHIN ISLAND PROPERTY          *
OWNERS ASSOCIATION, INC.         *
a non-profit corporation; and    *
JAMES W. HARTMAN,                *
                                 *
          Plaintiffs,            *
                                 *
     v.                          *
                                 *
THE UNITED STATES,               *
                                 *
          Defendant.             *
* * * * * * * * * * * * * * * * * * *
```

*Daniel Grant Blackburn*, Bay Minette, AL, attorney of record for plaintiffs, Dauphin Island Property Owners Association, Inc. and James W. Hartman, and *Lewis S. Wiener, Richard Davis* and *Joseph Steadman*, Washington, D.C., of counsel.

*Gary A. Moore*, U.S. Attorney's Office, Southern District of Alabama, and *James E. Brookshire*, Washington, D.C., of counsel.

### AMENDED OPINION AND ORDER

*Futey*, **Judge**.

This takings case comes before the court on the parties' joint motion for final approval of the settlement agreement among the United States, the State of Alabama, the Dauphin Island Property Owners Association ("the Association"), and James Hartman (as representative of the plaintiff class). On July 11, 2006, a fairness hearing was conducted in Mobile, Alabama. For the reasons stated below, the settlement on behalf of the class is approved.

Factual Background

A. *Summary of the Litigation and Negotiations*

Plaintiffs are owners of property on Dauphin Island, located in Mobile County, Alabama, on or adjacent to the Gulf of Mexico. The Association, which is comprised of "persons, firms, or entities which own property situated on Dauphin Island," owns certain lands on the island in fee, including stretches of beachfront property. Directly east of the island, the Army Corps of Engineers ("the Corps") maintains the Mobile Pass Channel ("the Channel"), which provides a navigable waterway to the Port of Mobile. Periodically, the Corps has dredged and deepened the Channel, removing material from the sea floor near the island.

On March 6, 2000, plaintiffs filed the instant case alleging that the Corps' dredging practices caused significant shoreline erosion of plaintiffs' property. Plaintiffs further claimed that this amounted to an uncompensated taking of their property, contrary to the Fifth Amendment. After over five years of negotiations, a proposed settlement was filed with the court on July 19, 2005, ("the Settlement") which included a joint motion for certification of the class. The case was certified as a class action on January 11, 2006. On July 11, 2006, a fairness hearing was conducted in Mobile, Alabama to determine the appropriateness of the settlement and to hear any objections of the class.

B. *Summary of the Major Terms of the Settlement*

Rather than providing a monetary remedy to class members, the Settlement contemplates studying the causes of the erosion and, if the Corps' construction or maintenance practices are determined to have caused erosion, to then implement measures aimed to replenish the beachfront and prevent further wearing away of the shoreline. Upon certain conditions, the Corps has agreed to modify its dredging disposal practices. Instead of disposing of the dredged material from the Channel into the historically designated locations in the Gulf of Mexico south of Dauphin Island, the Corps will dispose of the material in two areas nearer the shores of Dauphin Island. Naturally occurring conditions and currents of the Gulf Coast may, according to at least one theory, move or transport the material to the shores of Dauphin Island. In addition, the placement of this dredged material in these areas nearer the shore may help diffuse the energy of waves, both ordinary and those produced by hurricanes, that would normally hit Dauphin Island. This may help lessen and could perhaps prevent further erosion of the shoreline. The Corps may be temporarily relieved from this obligation to use nearer shore disposal sites when shallow draft equipment is not available when the work is advertised for bid, in emergency channel shoaling situations, and certain other circumstances justifying

such relief. These new dredging practices are already in place. Any benefit to the shoreline from this change in dredging practices is expected to occur over a lengthy term, and is subject to scientific study and confirmation.

The second component of the Settlement was the principal topic of the negotiation. All of the parties to the agreement have conferred and agreed upon a team of four highly qualified engineers to perform an "impact study." This study will attempt to discover if there is a measurable impact on the Dauphin Island shoreline which can be attributed to the Corps' dredging practices. The study will proceed in stages. The entire impacts study will be completed within twelve months of the execution of a feasibility cost sharing agreement.[1]

If the study shows that the Corps' dredging practices had no effect on Dauphin Island (a finding of negative impact), plaintiffs will dismiss the litigation with prejudice, subject to a provision that allows the parties to participate in alternative dispute resolution ("ADR"). The ADR process requires a heightened burden of proof. If the plaintiffs do not, in this circumstance, succeed in the ADR process, they will dismiss the litigation with prejudice. Notwithstanding a study result of negative impact, the Corps may in its own discretion declare the results inconclusive. In the latter instance, the process will move into the feasibility study phase.

If the impact study finding is positive, the Corps will, through the next phase of the process (called the feasibility study), formulate a project within eighteen months of that finding to mitigate the prior and prevent future erosion. If the Corps identifies and selects a mitigation project that falls with Section 111's statutory limit of $7,692,302.69, the Corps must begin construction of the project within 24 months. If the selected project is not achievable within that funding limit and (a) if Congress does not approve and appropriate funds for the selected plan within 36 months after the Corps' selection of it, or, alternatively, (b) if Congress does appropriate funds for the plan but the Corps fails to begin construction within 24 months of Congress' approval and funding, plaintiffs may reactivate the litigation.

---

[1] This type of settlement is contemplated under 33 U.S.C. § 426i, more commonly known as Section 111, which authorizes the Corps to undertake studies and implement measures to prevent or mitigate shore damages caused by projects such as the dredging of the Channel. *See* 33 U.S.C. § 426i. A requirement of Section 111, is that a local entity, such as the State of Alabama in this case, share the costs of the study and implementation. *See* 33 U.S.C. § 426i(b). This type of agreement is commonly referred to as a feasibility cost sharing agreement. Because of recent changes in legislation, Congressional approval is needed for this agreement. By letter dated August 7, 2006, defendant informed the court that this approval has been gained by both chambers of Congress.

There are circumstances and events contained in the settlement agreement that allow plaintiffs to petition the court to reactivate the litigation and, under several identified circumstances, the right to reactivate the litigation is subject to an agreed upon cap or limit of any monetary recovery to not greater than $7,692,302.69. As with regard to other aspects of this summary, the settlement agreement itself controls.

The settlement agreement also specifically reserves to the defendant the defense of statute of limitations if this litigation is reactivated. In the event that the statute of limitations defense fails and if the original finding of the impact study was positive, then the impact study's Final Report will be binding upon the defendant and the trial process would move to the issue of quantum, subject to the settlement agreement.

*C. Attorneys' Fees*

Defendant has agreed to pay stipulated litigation costs of $485,522.68 for fees and costs incurred up to April 1, 2005. Defendant has also agreed to pay fees and costs incurred after April 1, 2005 up to a total maximum of $417,480. This will be split among the four law firms representing the class in this case. The fees will not count against the feasibility cap mentioned above. In addition, the fees will not be paid unless the team of engineers determines the Minimum Measurable Quantity of loss of beachfront, which is defined generally as the loss of beachfront (if any) attributable to the Corps' construction, operation and maintenance dredging practices of and at the Channel – alone and singly, not in combination with any other causes. This determination will be made not later than four months of the effective date of the feasibility cost sharing agreement.

Discussion

Under Rule 23(e) of the Rules of the United States Court of Federal Claims "[a] class action shall not be dismissed or compromised without the approval of the court . . .." R.C.F.C. 23(e). The court must determine if the "proposed settlement is 'fair, reasonable and adequate' in order to approve it." *Berkley v. U.S.*, 59 Fed. Cl. 675, 681 (Fed. Cl. 2004) (quoting *In re Prudential Ins. Co. Of America Sales Practices Litigation*, 148 F.3d 283, 316 (3d Cir. 1998)). Many courts have considered the following five factors in determining the fairness of a class settlement:

> (1) The relative strengths of plaintiffs' case in comparison to the proposed settlement, which necessarily takes into account:
> (a) The complexity, expense and likely duration of the litigation; (b) the risks of establishing liability; (c) the risks of establishing damages; (d) the risks of maintaining the class

>action through trial; (e) the reasonableness of the settlement fund in light of the best possible recovery; (f) the reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation; (g) the stage of the proceedings and the amount of discovery completed; (h) the risks of maintaining the class action through trial;

(2) Class counsels' recommendation of the proposed settlement, taking into account the adequacy of class counsels' representation of the class;

(3) The reaction of the class members to the proposed settlement, taking into account the adequacy of notice to the class members of the settlement terms;

(4) The fairness of the settlement to the entire class;

(5) The fairness of the provision for attorney fees;

(6) The ability of the defendants to withstand a greater judgment, taking into account whether the defendant is a governmental actor or a private entity.

*Berkley*, 59 Fed. Cl. at 681-682 (citations omitted).

After a careful review of the settlement, all parties' counsels' comments, and the class members' comments, it is clear to the court that the settlement is fair, reasonable, and adequate by all measures.

First, the plaintiffs have strong claims, however, determining the extent and causes of the erosion without cooperation between all of the parties would be nearly impossible. The extent and complexity of the litigation as well as the risks of establishing liability and damages would be very high, as evidenced by the massive investigation that will proceed under the settlement and the time it will take to complete all aspects of the settlement. Furthermore, the risks of maintaining a class through trial would be considerable in that property ownership may turn over repeatedly during the course of litigation, potentially causing confusion over class membership or requiring repeated consents from potential class members. Defendant asserted the affirmative defense of statute of limitations raising the issue of whether plaintiffs waited too long to file this litigation. The Defendant has reserved this defense in the settlement agreement. Overall, the complicated nature of the claim and the class, the recovery under the settlement, including the cost of the studies required, easily balance out the strengths of plaintiffs' claims.

Second, class counsel's competency and acceptance of the settlement weigh heavily in favor of approval. Each member of the class' legal team has excellent qualifications and experience that are more than adequate to litigate this case. Further, class counsel conducted extensive negotiations with the government, and have worked diligently to inform the class members of the terms of the settlement. There have been a number of site visits to Dauphin Island and presentations to the class members and it is, therefore, clear to the court that the lawyers are well informed of the state of affairs on Dauphin Island. Accordingly, plaintiffs' counsels' acceptance of the settlement certainly points the court towards a finding of fairness.

The class members clearly support the settlement. Many members made positive statements about the settlement on their opt-in forms. At the fairness hearing, no objections were made to the settlement. The notice to the class was more than adequate as evidenced by the high number of replies to class counsels' mailings to the potential class members. In addition, the settlement is definitely fair to the entire class. The ultimate goal of the agreement is to scientifically determine to what extent, if any, the Corps' dredging practices affected the shoreline. If there is such a scientific finding, the Corps will complete a study to determine the most feasible way to repair damage done to the entire island and to prevent further erosion in the future. Although any remedial measures would help the beachfront property owners more directly because they will regain land, the entire island will benefit from the mitigation and prevention of further erosion. The lack of dissension within the class and the clear benefit to the class as a whole heavily favors approving the settlement.

The provision for attorneys' fees seems more than fair because any payment will not count against the limit of $7,692,302.69. In addition, the attorneys will not receive any fees unless it is determined that the study can proceed. This factor, therefore, certainly weighs in favor of approving the settlement.

Finally, the government's ability to withstand a greater judgment has little relevance here. Although the government could theoretically "always withstand greater judgment because of Congress's ability to tax" it would ultimately fall to the taxpayers to provide the necessary funds. *Berkley*, 59 Fed. Cl. at 713. In addition, if the case at hand went to trial and the plaintiff class prevailed, the court could only award monetary damages. *Bowen v. Massachusetts*, 487 U.S. 879, 914 (1988). This settlement provides for specific relief instead, which would likely be far more useful to each member of the class than his or her portion of the judgment. Considering the size of the class, each individual's share of a judgment would be small and inadequate to undertake a study and formulate a plan that would allow a reclamation of his or her property and prevention of future erosion. Therefore, it appears that all of the factors weigh in favor of the approval of the class settlement.

<u>Conclusion</u>

For the reasons discussed above, the court finds the Settlement Agreement among the United States, the State of Alabama, and the plaintiff class to be fair, adequate, and reasonable. The court hereby approves the Settlement Agreement as proposed by the parties.

The parties shall file a joint status report indicating progress in the implementation of the Settlement Agreement at intervals of 90 days. The first report shall be filed on Tuesday, November 14, 2006.

IT IS SO ORDERED.

                                                            s/Bohdan A. Futey
                                                    **BOHDAN A. FUTEY**
                                                          **Judge**