# In the United States Court of Federal Claims

No. 00-115L

(Filed November 24, 2009)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * | |
| **DAUPHIN ISLAND PROPERTY** * | |
| **OWNERS ASSOCIATION, INC.** *  | Fifth Amendment Taking; Class |
| a non-profit corporation; and        * | Actions; RCFC 23; Settlement, |
| **JAMES W. HARTMAN,**                * | voluntary dismissal, or |
|                                       * | compromise; Hearing and finding |
| Plaintiffs,                           * | regarding the fairness, |
|                                       * | reasonableness, and adequacy of |
| v.                                    * | a proposed settlement. |
|                                       * | |
| **THE UNITED STATES,**                * | |
|                                       * | |
| Defendant.                            * | |
| * * * * * * * * * * * * * * * * * * * | |

    ***Daniel G. Blackburn***, Blackburn & Conner, P.C., Bay Minette, Alabama, attorney of record for plaintiffs, Dauphin Island Property Owners Association, Inc. and James W. Hartman, and ***Lewis S. Wiener***, Sutherland, Asbill & Brennan, Washington, D.C., ***Richard E. Davis***, Daphne, Alabama, and ***Joseph D. Steadman***, Dodson & Steadman, P.C., Mobile, Alabama, of counsel.

    ***Wells D. Burgess***, U.S. Department of Justice, Environmental & Natural Resources Division, attorney of record for defendant, and ***Mark S. Barron***, U.S. Department of Justice, Environmental & Natural Resources Division, trial attorney, and ***Gary A. Moore***, U.S. Attorney's Office, Southern District of Alabama, and ***Joseph P. Givhan***, Assistant District Counsel, U.S. Army Corps of Engineers, and ***William D. Little***, Assistant Attorney General, Office of the Attorney General for the State of Alabama, of counsel.

## OPINION AND ORDER

    *Futey*, <u>Judge</u>.

    This case comes before the court for final approval of the Second Addendum to the Litigation Settlement Agreement between the representatives of the plaintiff class, Dauphin Island Property Owners Association, Inc. ("the Association"), and James W. Hartman, and defendant, the United States. The State of Alabama is not a named defendant in this litigation; however, as the local sponsor of the Army Corps of Engineers' ("the Corps") dredging activities the State agreed to be a party to any

agreement and share in certain cost.  In return the United States has released the State from certain indemnity claims.  On September 15, 2009, a fairness hearing was conducted in Mobile, Alabama.  For the reasons stated below, the settlement on behalf of the class is approved.

Factual Background

*A.     The History of the Case*

Plaintiffs are owners of property on Dauphin Island, located in Mobile County, Alabama, on or adjacent to the Gulf of Mexico.  The Association is comprised of persons, firms, or entities that own property situated on Dauphin Island.  Additionally, the Association owns certain lands on the island, including stretches of beachfront property.  The Corps, a federal agency, provides construction, operation and maintenance for the Mobile Ship Bar Channel ("the Channel"), which provides a navigable waterway to the Port of Mobile.  This maintenance includes dredging which is accomplished by removing, through various means, sediment from the Channel and disposing of the same in the nearshore, littoral or offshore locations in the Gulf of Mexico.

On March 6, 2000, plaintiffs filed the instant case alleging that the Corps' dredging practices caused significant shoreline erosion of their property.  Plaintiffs further claimed that this amounted to an uncompensated taking of their property contrary to the Fifth Amendment.  After over five years of negotiations, a proposed settlement was signed by the parties on July 15, 2005, ("the Settlement Agreement").  A notice regarding the Settlement Agreement, which included a joint motion for certification of the class, was filed on July 19, 2005.   The case was certified as an opt-in class action on January 11, 2006, and approximately 1,500 property owners, including 99% of the affected landowners on the southern shore of Dauphin Island, opted-in to the class. On July 11, 2006, a fairness hearing was conducted in Mobile, Alabama to determine the appropriateness of the Settlement Agreement and to hear any objections from the class.  On September 5, 2006, an Amended Opinion and Order was issued that approved the Settlement Agreement between the plaintiffs and defendant.

*1.     The Settlement Agreement of July 15, 2005*

The Settlement Agreement did not provide a monetary remedy to class members, rather it required a study of the causes of the erosion and, if the Corps' construction or maintenance practices were determined to have caused erosion, to then implement measures aimed to replenish the beachfront and prevent further wearing away of the shoreline.  Upon certain conditions, the Corps agreed to modify its dredging disposal practices.  Instead of disposing of the dredged material from the

Channel into the historically designated locations in the Gulf of Mexico south of Dauphin Island, the Corps agreed to dispose of the material in two areas nearer the shores of Dauphin Island. Naturally occurring conditions and currents of the Gulf Coast may, according to at least one theory, move or transport the material to the shores of Dauphin Island. In addition, the placement of this dredged material in areas nearer the shore may help diffuse the energy of waves, both ordinary and those produced by hurricanes, that would normally hit Dauphin Island. These new dredging practices were already in place when the Settlement Agreement was approved by the court.

The second component of the Settlement Agreement was the decision by all parties to use a team of four highly qualified engineers to perform an impact study. The study's goal was to discover if there is a measurable impact on Dauphin Island's shoreline which can be attributed to the Corps' dredging practices. The study was to proceed in stages, with a Draft Impacts Study completed and presented not later than 10 months from the later of either the effective date of the Settlement Agreement or the date of the Feasibility Cost Sharing Agreement. All members of the team had 30 days to review and comment on the Draft Impacts Study, and then 30 days after the review a Final Report was submitted.

If the Final Report finding was positive, meaning that "the quantity of erosion attributable to the Corps' construction, operation and Maintenance Dredging Practices of and at the Channel is above the Minimum Measurable Erosion of Dauphin Island's shoreline," then the parties would proceed to the next phase of the process– the Feasibility Study Phase. *See* Settlement Agreement ¶ 3(e). If, however, the study showed that the Corps' dredging practices had no effect on Dauphin Island's shoreline (a finding of negative impact), plaintiffs agreed to dismiss the litigation with prejudice, subject to a provision that allowed the parties to participate in alternative dispute resolution ("ADR"). According to the Settlement Agreement, the ADR process required a heightened burden of proof. If the plaintiffs did not succeed in ADR, the case would be dismissed with prejudice. Notwithstanding a study result of negative impact, the Corps could, in its own discretion, declare the results inconclusive and the process would move into the Feasibility Study Phase.

In the Settlement Agreement, defendant also reserved a statute of limitations defense. In the event that the statute of limitations defense failed and if the original finding of the impact study was positive, then the impact study's Final Report would be binding upon the defendant and litigation would proceed to the damages phase.

    2.    *Events After the Approval of the Settlement Agreement of July 15, 2005*

After the fairness hearing on July 11, 2006, the court ordered the parties to

file joint status reports regarding implementation of the Settlement Agreement every ninety days. The parties filed numerous joint status reports during 2007 and 2008. On January 10, 2008, the Final Report was submitted by the Principal Investigator ("PI"), Dr. Mark Byrnes of Applied Coastal Research and Engineering, to the members of the Independent Technical Review Team ("ITRT")[1] in accordance with the Settlement Agreement and the court's Order of November 5, 2007. The Final Report was negative; there was "a determination that the Corps' construction, operation and Maintenance Dredging Practices of and at the Channel have not resulted in at least Minimum Measurable Erosion of Dauphin Island's shoreline." *See* Settlement Agreement ¶ 3(f). According to the court's order of February 5, 2008, plaintiffs' ITRT team member Dr. Dean, had until March 10, 2008, to provide a written dissent to the Final Report.

Dr. Dean dissented and indicated that the Final Report was fundamentally flawed, not reliable and at best inconclusive. Dr. Dean's dissent in writing triggered certain provisions in the Settlement Agreement and on May 5, 2008, defendant informed the court that it would not elect to declare the findings of the Final Report inconclusive as allowed pursuant to paragraph 3(f)(i) of the Settlement Agreement. On May 8, 2008, plaintiffs filed a motion and informed the court that they wished to exercise their right to request an ADR Judge "to hold a confidential neutral evidentiary evaluation on the question of whether the PI determination in the Final Report is fundamentally flawed, plainly wrong, or arbitrary." *See* Settlement Agreement ¶ 3(f)(ii). If the ADR Judge found that the PI's determination was fundamentally flawed, plainly wrong or arbitrary the Corps would be obligated to undertake a beach nourishment project subject to a feasibility determination or litigation could commence. In the event the ADR Judge determined that the PI's Final Report was not fundamentally flawed, plainly wrong, or arbitrary then the case would be dismissed. In the same motion plaintiffs requested a stay of the case and a delay in assignment to an ADR Judge until the PI presented his findings in a public forum on Dauphin Island as required in Exhibit A of the Settlement Agreement.

On July 28, 2008, the parties filed a status report that notified the court that Dr. Byrnes publically presented his Final Report on July 16, 2008. The status report also requested that the case proceed to ADR. On July 29, 2008, this case was assigned to Judge Eric G. Bruggink for ADR. Shortly thereafter, Judge Bruggink held a status conference and then issued a scheduling order on September 12, 2008, which included briefing deadlines and scheduled two ADR sessions in Alabama.

---

[1] Pursuant to paragraph 3(a), (b) of the Settlement Agreement, the ITRT consisted of: Dr. Robert Dean, University of Florida (for plaintiffs); Dr. Nicholas Kraus, U.S. Army Corps of Engineers, Engineering Research Development Center (for the United States); and Mr. Robert Mink, Geological Survey of Alabama (for the State).

Prior to the start of ADR proceedings the parties decided to attempt to settle the matter through direct negotiations. The parties met on January 27, 2009, and outlined the basic parameters for an agreement. On June 8, 2009, the parties appeared in Washington, D.C., and advised the court that the Second Addendum to the Litigation Settlement Agreement ("Second Addendum") was almost complete.

On June 22, 2009, the fairness hearing was scheduled for September 15, 2009. On July 30, 2009, the parties filed an expedited motion for approval of the Notice to the Class Members in Advance of the Hearing on September 15, 2009 ("the Notice"). On August 4, 2009, the Notice was approved, with some minor changes to the settlement agreement recommended by the court. Thereafter, on August 14, 2009, the Second Addendum was executed.

### 3. *The Second Addendum to the Litigation Settlement Agreement*

The Second Addendum was executed to "mitigate the mutual risks of proceeding in ADR." Second Addendum, Recitals ¶ 5. According to the Second Addendum, *inter alia*, defendant and the State have agreed to pay plaintiffs $1.5 million dollars in full and final settlement of all claims, including all claims for attorneys' fees and costs. *Id.* ¶ 1. Plaintiffs agreed to release and discharge the United States and the State of Alabama from all liability and covenant not to sue for past, present or future erosion resulting from the construction, operation and maintenance of the Channel. *Id.* ¶ 2. This release of all liability is valid only if the Corps construction, operation and maintenance is within the dimensional limits of the Channel's current congressional authorization and the Corps conducts its maintenance dredging practices to deposit material dredged from the Channel in the Sand Island Beneficial Use Area and/or the Feeder Berm Disposal Area subject to the limitation in section 5(d) of the Second Addendum. *Id.* ¶ 2(a),(b).

### B. *The Fairness Hearing of September 15, 2009*

The court traveled to Mobile, Alabama, and on September 15, 2009, held a fairness hearing at the United States District Court for the Southern District of Alabama. At the hearing, the court heard the following: opening statements from both plaintiffs' and defendant's counsel; support from class representatives, Mr. James Hartman and Mr. Bill Harper, President of the Association; support from Jeff Collier, the Mayor of Dauphin Island; objections from thirteen individual members of the class; and defendant's presentations by Dr. Susan Ivester Rees of the Corps and Mr. James K. Lyons, Director and Chief Executive Officer of the Alabama State Port Authority.

## 1. *Support for the Second Addendum*

At the fairness hearing, the court heard support for the settlement from the named class representatives and other class members, as well as a presentation from defendant's technical experts. These witnesses all testified that the Second Addendum was an appropriate compromise.

For the class, James Hartman, a class representative, testified that he favored the Second Addendum. Tr. 46:4-51:18. The Mayor of Dauphin Island, Jeff Collier, stated that he was in favor of using any funds from a settlement in conjunction with a National Oceanic and Atmospheric Administration grant to help replenish Dauphin Island's beaches. Tr. 53:24-54:5. Bill Harper, President of the Association, described how plaintiffs' case appeared to be "falling apart" in the summer of 2008. Tr. 56:1-25. Mr. Harper encouraged counsel to settle this case. Tr. 57:9-12. Mr. Harper also believes that money from this settlement could be combined with other funds to finance a study of the needs of Dauphin Island's coastline. Tr. 57:13-23.

The court also heard technical testimony from two experts. These experts responded to one of the primary concerns of objectors, that future expansion of the Channel would result in shoreline erosion of plaintiffs' property. Currently, the Channel is 47 feet by 600 feet; however, according to the Water Resources Improvement Act the Channel is authorized to 57 feet by 700 feet. Tr. 130:23-25; 131:1-12. Dr. Susan Ivester Rees, of the Corps, testified that according to the Water Resources Development Act the cost of any construction and maintenance in the Channel would be equally shared between the Corps and the Alabama State Port Authority. Tr. 133:1-21; 134:11-19. James Lyons, Director and Chief Executive Officer of the Alabama State Port Authority, then testified that expansion of the Channel to its authorized limits would be incredibly costly. Tr. 157:24 -160:2. Mr. Lyons stated, "I don't think there would be enough business to justify [expansion]. I don't think I would even ask the Corps or try to even spend any money on trying to study it." Tr. 164:18-21. Both Dr. Rees and Mr. Lyons testified that dredging the Channel to the authorized limits is unlikely because it is both unnecessary and extremely costly.

## 2. *Objections to the Second Addendum*

Thirteen objectors also testified, and over one hundred objectors submitted written comments prior to the hearing. Additionally, written objections were received during the fairness hearing and objections where filed with the court on October 14 and November 16, 2009. The objections contain three primary areas of concern with the Second Addendum.

First, objectors are concerned with the adequacy of the settlement arguing that

the settlement provides too low a recovery to compensate plaintiffs for the damage caused by erosion. Written comments described the settlement as "very little net money for [a] huge problem,"[2] "insufficient . . . compared to what the Class is being required to give up,"[3] and "unconscionable."[4] Testimony at the fairness hearing labeled the settlement "measly"[5] and "not fair,"[6] as well as "grossly unfair" when the scope of possible future erosion is unknown.[7]

Second, objectors indicated that they have not received adequate information. Objectors contend that they did not know that entering the class would bind them to a class judgment or settlement, or that they would be waiving the right to sue for future erosion. For instance, Mr. William Stevens testified at the hearing, "Anything in the past, I understand as a Member of the Class, I could not sue individually over past erosion, but it is the future part that I have objection to." Tr. 80:10-13. Some objectors are concerned that plaintiffs' counsel and the named representatives did not inform individual class members of the status of the settlement negotiations. For example, Ms. Laura Martin testified at the hearing, "I have attempted several times to contact [the Association] and they've completely ignored my requests . . . . I feel like I've been ignored and there might be other people like me out there that are trying to get in contact with them and they're just ignoring me." Tr. 112:8-17.

Third, many objectors are concerned that the settlement allows the Corps to expand the Channel up to the "authorized" area. Currently, the Corps dredges an area of approximately 47 feet by 600 feet, while the Corps is authorized by the Water Resources Development Act of 1986 to dredge a larger area of 57 feet by 700 feet. Mr. Coffee, a former Corps employee, testified that he and other class members were told the settlement only covered the smaller area. Tr. 86:25-87:2. Mr. Coffee believes this was because some of the plaintiffs' lawyers were unaware that the "authorized" language in the settlement would allow for an expansion of the dredging area.

Related to these latter two objections, many assert that the terms of the

---

[2] Pls.' Br., Ex. J (Ronald Benoit).

[3] Pls.' Br., Ex J (Glendon and Deborah Coffee).

[4] Pls.' Br., Ex J (James and Dee Frazell).

[5] Tr. 68:1-14 (Stan Graves).

[6] Tr. 118:10-16 (Tiffin Greer Cowden).

[7] Tr. 95:11-23 (Glenn Coffee).

settlement are too "unknown" at this time for an informed decision to be made. For instance, Mr. Graves testified at the hearing, "[W]e are being told to give up, fully release and fully discharge the United States Government for a project that has not been developed, not constructed, with unknown consequences and unknown future damages." Tr. 61:10-19. The written comments show a similar concern; numerous class members complain that they are "giving up . . . fifth amendment rights for an unknown."[8]

      3.     *Post-hearing briefs*

On September 30, 2009, post-hearing briefs were filed by both parties. They were quite similar. The court must "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished." **In re Cendant Corp. Litig.**, 264 F.3d 201, 231 (3d Cir. 2001) (quoting **In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.**, 55 F.3d 768, 785 (3d Cir. 1995); *see also* **Moore v. United States**, 63 Fed. Cl. 781, 783 (2005) (stating that the trial court acts as a fiduciary serving as a guardian of the rights of absent class members). Supplemental briefs were therefore ordered. Plaintiffs' supplemental brief was due on October 30, 2009; however, plaintiffs failed to timely file. On November 2, 2009, this court held an unscheduled status conference to address plaintiffs' failure to file. On November 6, 2009, with leave from the court, plaintiffs filed their supplemental brief. Defendant filed its response on November 13, 2009, and plaintiffs filed their reply on November 16, 2009.

Discussion

*A.*    *Standards for Decision*

Rule 23 of the Rules of the United States Court of Federal Claims ("RCFC") governs class actions before this court. This rule is modeled on Fed. R. Civ. P. 23, and while there are differences, cases from other federal courts that apply Fed. R. Civ. P. 23 are relevant to this court's interpretation of RCFC 23. **Haggart v. United States**, No. 09-103, 2009 WL 3152383, at *3 (Fed. Cl. Sept. 28, 2009) (citing **Barnes v. United States**, 68 Fed. Cl. 492, 494 n.1 (2005)). One of the differences between RCFC 23 and Fed. R. Civ. P. 23, is that "unlike the FRCP, the court's rule contemplates only opt-in class certifications, not opt-out classes. The latter were viewed as inappropriate here because of the need for specificity in money judgments against the United States, and the fact that the court's injunctive powers – the typical focus of an opt-out class – are more limited than those of a district court." Rules Committee Notes (2002). This class action was certified by the court on January 11,

---

[8] *See,* e.g., Pls.' Br., Ex. J (Lisa Andrews).

2006, and all of the current class members affirmatively joined the class by April 17, 2006.[9]

Pursuant to RCFC 23(e), "The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." RCFC 23(e). The court may only approve a proposed settlement if it is "fair, reasonable and adequate." ***Berkley v. U.S.***, 59 Fed. Cl. 675, 681 (2004) (quoting ***In re Prudential Ins. Co. of Am. Sales Practices Litig.***, 148 F.3d 283, 316 (3d Cir. 1998)). In evaluating the settlement agreement this court must assess both the strengths and weakness of each parties' position; however, it should not "decide the merits of the case or resolve unsettled legal questions." ***Nat'l Treasury Employees Union v. United States***, 54 Fed. Cl. 791, 797 (2002) (citing ***Carson v. Am. Brands, Inc.***, 450 U.S. 79, 88 n. 14 (1981)). Settlement is always favored, "particularly in class actions and other complex cases where substantial [] resources can be conserved by avoiding formal litigation." ***In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.***, 55 F.3d at 784 (citations omitted); *see also **Berkley***, 59 Fed. Cl. at 681 ("Class actions, by their complex nature, carry with them a particularly strong public and judicial policy in favor of settlement.").

B.   *Factors to Consider in Analyzing the Fairness of the Second Addendum*

The case law and rules of this court do not provide definitive factors for evaluating the fairness of a proposed settlement. Many courts have, however, considered the following factors in determining the fairness of a class settlement:

> (1) The relative strengths of plaintiffs' case in comparison to the proposed settlement, which necessarily takes into account:
>> (a) The complexity, expense and likely duration of the litigation; (b) the risks of establishing liability; (c) the risks of establishing damages; (d) the risks of maintaining the class action through trial; (e) the reasonableness of the settlement fund in light of the best possible recovery; (f) the reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation; (g) the stage of the proceedings and the amount of discovery completed; (h) the risks of maintaining the class action through trial;
>
> (2) The recommendation of the counsel for the class regarding the

---

[9] On July 12, 2006, the parties filed a Joint Motion to Add Class Members. According to the motion, after the deadline of April 17, 2006, several individuals indicated that they sought to join the class and provided opt-in forms to plaintiffs' counsel. On July 19, 2006, the court granted the motion and added twenty people to the class effective, *nunc pro tunc*, April 17, 2006.

proposed settlement, taking into account the adequacy of class counsels' representation of the class;

(3) The reaction of the class members to the proposed settlement, taking into account the adequacy of notice to the class members of the settlement terms;

(4) The fairness of the settlement to the entire class;

(5) The fairness of the provision for attorney fees;

(6) The ability of the defendants to withstand a greater judgment, taking into account whether the defendant is a governmental actor or a private entity.

***Berkley***, 59 Fed. Cl. at 681-82 (citing ***In re Prudential Ins. Co. of Am. Sales Practices Litig.***, 148 F.3d at 317, 329; ***Staton v. Boeing***, 327 F.3d at 959, 961; ***D'Amato v. Deutsche Bank***, 236 F.3d 78, 86 (2d Cir.2001)). In reviewing a settlement agreement the court can determine the appropriate weight to give each of the six factors above. ***Berkley***, 59 Fed. Cl. at 682 (citing ***Torrisi v. Tucson Elec. Power Co.***, 8 F.3d 1370, 1375-76 (9th Cir. 1993)). Most importantly, this court must compare the terms of the settlement agreement with the potential rewards of litigation and consider the negotiation process through which agreement was reached. ***Christensen v. United States***, 65 Fed. Cl. 625, 628-29 (2005); *see also* ***Nat'l Treasury Employees Union***, 54 Fed. Cl. at 797 ("Such approval should be given based on the court's assessment of the reasonableness of the proposed compromise, taking into account the context in which the settlement was reached.").

    *1.    The relative strengths of plaintiffs' case in comparison to the proposed settlement*

To determine the relative strength of the plaintiffs' case compared to the proposed settlement the court must review how the case would have proceeded if the parties had not reached the agreement in the Second Addendum. The Settlement Agreement of July 15, 2005, laid out a framework for this case. On January 10, 2008, as required by the Settlement Agreement, the Final Report was submitted by Dr. Byrnes. The Final Report determined "that the Corps' construction, operation and Maintenance Dredging Practices of and at the Channel have not resulted in at least Minimum Measurable Erosion of Dauphin Island's shoreline." *See* Settlement Agreement ¶ 3(f). Plaintiffs' expert, Dr. Dean, dissented and indicated that the Final Report was fundamentally flawed, not reliable and at best inconclusive. On May 8, 2008, plaintiffs informed the court that they wished to exercise their right to request an ADR Judge "to hold a confidential neutral evidentiary evaluation on the question

of whether the PI determination in the Final Report is fundamentally flawed, plainly wrong, or arbitrary." *See* Settlement Agreement ¶ 3(f)(ii).

According to the Settlement Agreement of July 15, 2005, which was approved by this court, the ADR process required a heightened burden of proof. If the ADR Judge found that the Final Report was fundamentally flawed, plainly wrong or arbitrary then the Corps would be obligated to undertake a beach nourishment project subject to a feasibility determination or litigation could commence. In the event the ADR Judge determined that the PI's Final Report was not fundamentally flawed, plainly wrong or arbitrary then the case would be dismissed. Participating in ADR, therefore, held risks for plaintiffs including the possibility of dismissal with prejudice.

In the event the plaintiffs did succeed in ADR, the risks of maintaining the case through trial would be considerable. As with any litigation considerable time, resources and effort would be expended and the outcome of any litigation is unknown. Additionally, according to the Settlement Agreement of July 15, 2005, defendant planned to assert the affirmative defense of statute of limitations.

In this case the burden was on plaintiffs to prove in ADR that the Final Report was fundamentally flawed, plainly wrong or arbitrary before trial could commence. If plaintiffs were able to meet that burden, they would then be faced with all the defenses available to defendant. In balancing the strength of the plaintiffs' case against the proposed settlement the court finds that the analysis weighs in favor of settlement.

> 2.  *The recommendation of counsel for the class regarding the proposed settlement, taking into account the adequacy of class counsels' representation of the class*

The competency and acceptance of the settlement by counsel for the class weighs heavily in favor of approval. ***Nat'l Treasury Employees Union***, 54 Fed. Cl. at 797 ("In particular, the professional judgment of plaintiff's counsel is entitled to considerable weight in the court's determination of the overall adequacy of the settlement." (citing ***Luevano v. Campbell***, 93 F.R.D. 68, 88 (D.D.C.1981))). Counsel for the class conducted extensive negotiations with the government and have worked diligently to inform the class members of the terms of the settlement. This case has been pending before the court since 2000, and the parties have already successfully negotiated the Settlement Agreement of July 15, 2005.

On November 6, 2009, plaintiffs' counsel filed their supplemental brief which detailed the negotiations between the parties to arrive at the agreement found in the Second Addendum. Plaintiffs' supplemental brief also contained twenty exhibits,

including emails between the parties and drafts of the Second Addendum. Communications between plaintiffs' counsel and the class representatives regarding the Second Addendum were also detailed in the supplemental brief. Mr. Harper, the president of the Association, through Mr. Cliff Brady, General Counsel for the Association, requested that plaintiffs' counsel attempt to settle this matter and even suggested a settlement amount of $1.5 million. Pls.' Suppl. Br. at 2-3. Additionally, there have been a number of site visits to Dauphin Island and presentations to the class members and it is, therefore, clear to the court that the lawyers are well informed of the state of affairs on Dauphin Island. Accordingly, acceptance of the settlement by counsel for the class certainly weighs in favor of a finding of fairness.

> 3. *The reaction of the class members to the proposed settlement, taking into account the adequacy of notice to the class members of the settlement terms*

A court may approve a proposed settlement even if a large number of class members object to it. ***Berkley***, 59 Fed. Cl. at 687 (citations omitted). If only a small number of members object, however, a court may consider that fact as "strongly favor[ing] settlement." ***Stoetzner v. U.S. Steel Corp.***, 897 F.2d 115, 119 (3d Cir. 1990) (finding twenty-nine objections out of two hundred and eighty-one class members "strongly favors settlement"). In assessing the objections of class members, it is useful to remember that "[a] fair settlement need not satisfy every concern of the plaintiff class." ***Nat'l Treasury Employees Union***, 54 Fed. Cl. at 798 (quoting ***Alliance to End Repression v. City of Chicago***, 91 F.R.D. 182, 195 (N.D. Ill. 1981)).

In response to the Notice, two hundred and thirty-eight individuals submitted responses.[10] One hundred and twenty-three of these were negative, while one hundred and two were positive. Additionally, thirteen responses expressed no opinion or returned an incomplete form.[11] At the hearing, thirteen class members testified in opposition to the settlement. Nearly all class members desire to settle the suit;[12] however, objections have been made to a few specific terms of the settlement.

---

[10] The number of actual responses received is somewhat higher; however, some plaintiffs submitted multiple responses, which have not been counted towards the total number of responses received.

[11] On November 13, 2009, plaintiffs' counsel filed a third supplemental brief that included additional responses that were received – five objections and one that expressed no opinion were forwarded to the court.

[12] "I will tell you right now that I am for settling and finding a way to settle it. I am opposed to the terms." Tr. 61:5-7 (Stan Graves); "I am very much in favor of the settlement. . . . [W]e can make this settlement agreement more palatable to

Approximately sixteen percent of the class responded to the Notice. Counsel for plaintiffs and defendant argue that the silence of the large majority of the class should be construed as consent. The objectors, on the other hand, assert that the silence highlights the lack of "adequate information" given to class members about the contents of the Second Addendum. Tr. 82:7-22. In his September 24, 2009 letter, Mr. Graves writes that "the number of Class members that would have actually opposed the 2nd Addendum would have been much higher than those approving of it had all Class members been fairly and adequately informed."

Objectors, also, for the first time raise the issue that they had no notice that joining the class would bind them to the class judgment. The original notice of certification and settlement, however, clearly stated that by joining the class their legal rights would be affected. On December 10, 2005, plaintiffs' counsel made a presentation regarding the litigation during which they specifically explained that opting-in would bind the entire class to any judgment or settlement and would limit the right to sue individually. Pls.' Suppl. Br. at 15; Ex. 18. Plaintiffs' third supplemental brief included a copy of an insert from the Associations' newsletter of January 2006, which specifically stated:

> The settlement will not go forward unless virtually all property owners, particularly those owning property along the Gulf, agree to "opt-in", thereby binding themselves to the ultimate outcome in the case. This "opting-in" is required by the government so that an individual property owner cannot at some future time bring his/her own separate lawsuit against the Corps.

Pls.' Suppl. Br., Ex. 19. Furthermore, being bound to a class settlement is not particular to this settlement but instead is a common feature of class actions. *See, e.g.,* ***Devlin v. Scardelletti***, 536 U.S. 1, 9 (2002) (noting that "[t]he District Court's approval of the settlement . . . binds petitioner as a member of the class"). The language used in this case was adequate to apprise a putative class member of the binding effect of a class judgment, and any objections to it should have been made years ago, as this was certified as an opt-in class action on January 11, 2006. Approximately 1,500 property owners, including 99% of the affected landowners on the Southern shore of Dauphin Island, took affirmative steps to become members of the class.

Joining a class action carries with it the risk that one may not be entirely happy with the outcome of the litigation. Now, after having affirmatively opted-in

---

more Property Owners." Tr. 82:1-10 (Glenn Coffee);  "The majority of us are actually for the settlement, but we are opposed or disagree with some of the wording . . . ." Tr. 98:15-17 (Eileen Connolly).

to the class, the objectors cannot abandon the class because they are not completely satisfied with the negotiated compromise. Several plaintiffs asked the court to let them "opt-out" or "rescind" their decision to opt-in; however, the Court of Federal Claims has no such procedures.

The court is also not persuaded by the characterization of the settlement as "measly" by some plaintiffs. As discussed above, plaintiffs would face a difficult path if they chose to litigate this suit instead of settle it. The scientific study showed that erosion was not due to the Corps' activity, and plaintiffs would face a heightened burden of proof if they were to challenge this finding in an ADR proceeding. In light of the uncertainties of further litigation and the fact that plaintiffs could easily recover nothing, $1.5 million is not a paltry figure. *See, e.g.,* ***Christensen***, 65 Fed. Cl. at 631 ("[T]he risks faced by each side in the litigation weigh heavily in favor of approval of the settlement.").

The court does recognize that plaintiffs have raised valid concerns regarding the settlement. It is true that the Channel at issue could be dredged to a greater size. The objectors, however, put too much weight in this concern. Dr. Rees and James Lyons both emphasized the extreme unlikelihood of such a project ever being undertaken. Additionally, even if the Channel was dredged to the congressionally authorized limits, there may be little impact to the shoreline. Plaintiffs' counsel, as well as Mr. Brady, the General Counsel to the Association, each contacted individual coastal engineers both of whom expressed the opinion that expansion of the Channel to congressionally authorized limits would not likely result in more erosion on Dauphin Island. Pls.' Suppl. Br. at 9. The government could have agreed to remove these terms from the settlement, however, it is emphatically not this court's job to rewrite the settlement or second guess its terms. ***Berkley***, 59 Fed. Cl. at 681 (citing ***Evans v. Jeff D.***, 475 U.S. 717, 726-27 (1986); ***Hanlon v. Chrysler Corp.***, 150 F.3d 1011, 1026 (9th Cir. 1998)). The objectors correctly point out that the settlement contains a broad waiver of rights to sue for future erosion. In return for this waiver, however, *inter alia*, plaintiffs will receive a substantial amount of money that will allow them to finance a study that will hopefully result in a successful beach replenishment project.

In sum, while there are valid objections to the Second Addendum the court finds that the objections do not provide the court with a factual or legal reason to disapprove the settlement.

### 4. *The fairness of the settlement to the entire class*

A court must also ensure that the terms of a settlement treat the class as a whole fairly. "[A] settlement that gives uniform relief to all class members is fair if no identifiable segment can show that factual differences entitle it to a

disproportionately larger recovery." ***Berkley***, 59 Fed. Cl. at 711 (citation omitted). In this case, the settlement does not single out any particular group of plaintiffs, nor does any group merit special treatment. Thus, the settlement treats the class as a whole fairly.

     5.    *The fairness of the provision for attorney fees*

As with other elements of a settlement, attorneys' fees must be reasonable. ***Berkley***, 59 Fed. Cl. at 711 (stating that fees must be "'fair, adequate, and reasonable'") (quoting ***Staton v. Boeing Co.***, 327 F.3d 938, 959 (9th Cir. 2003)). The Court of Appeals for the Federal Circuit has not specified any particular factors to consider or any specific method for assessing the reasonableness of attorneys' fees. ***Moore***, 63 Fed. Cl. at 786.

In this case, counsel for the class will be paid out of the total settlement amount. This type of payment is not unusual for a class action. ***Berkley***, 59 Fed. Cl. at 711-12; ***Nat'l Treasury Employees Union***, 54 Fed. Cl. at 807. Plaintiffs' counsel estimates that their current fees will be less than $200,000.[13] This represents approximately 13% of the $1.5 million settlement. Some class members have objected to the amount of attorneys' fees. The amount of attorneys' fees, however, is not unreasonable. In other cases before the Court of Federal Claims, plaintiffs' counsel in class actions have recovered similar amounts in fees. *See* ***Christensen***, 65 Fed. Cl. at 629 (recovering 7% of the total settlement); ***Moore***, 63 Fed. Cl. at 789 (recovering 34%, although class counsel had asked for 40%); ***Berkley***, 59 Fed. Cl. at 712 (recovering 7% of the total settlement); ***Nat'l Treasury Employees Union***, 54 Fed. Cl. at 807 (recognizing that class counsel's request for a 10% common fund award is well below the typical 20-30% fee awards in class actions).

     6.    *The ability of the defendants to withstand a greater judgment, taking into account whether the defendant is a governmental actor or a private entity*

Defendant's ability to withstand a greater judgment has little relevance here. Although the government could theoretically "always withstand greater judgment because of Congress's ability to tax" it would ultimately fall to the taxpayers to provide the necessary funds. ***Berkley***, 59 Fed. Cl. at 712-13. In addition, if the instant case went to trial and the class prevailed, the court could only award monetary damages. ***Bowen v. Massachusetts***, 487 U.S. 879, 914 (1988). This settlement provides for a monetary award to be used for a beach nourishment project.

---

[13] Pls.' Br. at 19. Pursuant to the Settlement Agreement, plaintiffs' counsel has previously been paid a portion of their attorney fees; however, this initial payment was directly from the United States and not from any settlement amount.

Considering the size of the class, each individual's share of a judgment would be small and inadequate to undertake a study and formulate a plan that would allow a reclamation of his or her property and prevention of future erosion.

After careful review of the settlement, counsels' comments, and the class members' comments, it is clear to the court that the settlement is fair, reasonable, and adequate by all measures. The proposed settlement does not satisfy every plaintiff, but this is not unusual. As the Court of Appeals for the Ninth Circuit explained, "[T]he very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" ***Officers for Justice v. Civil Serv. Com'n of City and County of San Francisco***, 688 F.2d 615, 624 (9th Cir. 1982) (citing ***Cotton v. Hinton***, 559 F.2d 1326, 1330 (5th Cir. 1977); ***Moore v. City of San Jose,*** 615 F.2d 1265, 1271 (9th Cir. 1980); ***Pettway v. Am. Cast Iron Pipe Co.***, 576 F.2d 1157, 1169 (5th Cir. 1978), cert. denied, 439 U.S. 1115, 99 S. Ct. 1020, 59 L. Ed.2d 74 (1979); ***Mandujano v. Basic Vegetable Prods., Inc.***, 541 F.2d 832, 835 (9th Cir. 1976)). While the "highest hopes" of objectors in this case encompass more stringent terms and a larger recovery, defendant's hopes just as surely contain less stringent terms and a smaller recovery. "[A] settlement agreement achieved through good-faith, non-collusive negotiation does not have to be perfect, just reasonable, adequate, and fair." ***Joel A. v. Giuliani***, 218 F.3d 132, 144 (2d Cir. 2000).

## Conclusion

For the reasons discussed above, the court finds the Second Addendum between the plaintiff class, and the United States and the State of Alabama to be fair, reasonable, and adequate. The Second Addendum to the Litigation Settlement Agreement, as proposed by the parties, is hereby APPROVED.

Plaintiffs shall file a stipulation of dismissal by December 15, 2009, as required by the Second Addendum.

IT IS SO ORDERED.

                         s/Bohdan A. Futey
                         **BOHDAN A. FUTEY**
                               **Judge**